IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALTON THOMPSON, as representative )
for the Deceased Claimant, )
CYD DENISE THOMPSON, )
                      )
         Plaintiff, )
                      )     **No. 12 C 585**
    v. )
                      )     **Magistrate Judge Sidney I. Schenkier**
                      )
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security,[1] )
                      )
         Defendant. )

## MEMORANDUM OPINION AND ORDER[2]

Alton Thompson, as representative for the deceased Claimant Cyd Denise Thompson,[3]

has filed a motion seeking reversal or remand of a determination by the Commissioner of Social

Security, Carolyn W. Colvin ("Commissioner"), denying Ms. Thompson Disability Insurance

Benefits ("DIB") (doc. # 27). The Commissioner has filed a cross-motion for summary

judgment seeking to affirm the denial of benefits (doc. # 31). For the reasons stated below, we

deny Mr. Thompson's motion and grant the Commissioner's motion to affirm.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as defendant.

[2] On May 2, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 12, 13, 14).

[3] Ms. Thompson filed her complaint in district court on January 26, 2012 (doc. # 1). On August 16, 2012, Alton Thompson filed a "Motion to Substitute on Death of Claimant," advising the Court that Ms. Thompson died on August 1, 2012, and seeking leave, as her surviving spouse, to substitute as plaintiff in this case (doc. # 24). The motion was unopposed, and on August 17, 2012, this Court granted the motion (doc. # 26).

# I.

On February 23, 2010, Ms. Thompson applied for a period of disability and disability insurance benefits, alleging disability beginning May 1, 2002 (R. 119-24. 142). Ms. Thompson's last insured date was June 30, 2003 (R. 142). Her application was denied initially on April 19, 2010, and upon reconsideration on July 7, 2010 (R. 55, 56). She requested a hearing before an administrative law judge ("ALJ"), which was granted, and held subsequently on July 27, 2011 (R. 29-54). On August 18, 2011, the ALJ issued a decision finding that from May 1, 2002 through the date last insured, June 30, 2003, Ms. Thompson was not disabled under sections 216(i) and 223(d) of the Social Security Act ("the Act") (R. 16-23); *see* 42 U.S.C. §§ 416(i) & 423(d). The Appeals Council denied Ms. Thompson's request for review (R. 1-5), making the ALJ's decision the final decision of the Commissioner. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

# II.

We begin with a brief background, a summary of the medical records during the relevant time period and immediately thereafter, a general review of the remainder of the medical record, a discussion of the state agency medical consultants' reports, and then proceed to consider the hearing testimony given by Ms. Thompson and the vocational expert, as well as the ALJ's written decision.

# A.

Ms. Thompson was born on October 16, 1952 and was 50 years old on her date last insured, June 30, 2003 (R. 121, 142). She was a college graduate, had a master's degree in health care administration and marketing, and was married to Alton Thompson (R. 146, 35). Ms. Thompson stopped working on December 1, 1999, because of her "condition(s) and other

reasons" but alleged a disability onset date of May 1, 2002 (R. 142, 148). Before that, among other things, she had worked for an insurance company in public relations and marketing and had been an administrative assistant to a physician (R. 37-39). Initially, Ms. Thompson claimed that pulmonary sarcoidosis limited her ability to work (R. 147), and on July 25, 2011, two days before the hearing, Ms. Thompson's attorney wrote to the ALJ alerting the ALJ that, in addition to sarcoidosis, Ms. Thompson suffered from chronic asthma, back pain, hypertension, and depression (R. 2535-37). She was 5'7" and weighed 240 pounds when she filed her application for disability benefits (R. 147).

The record in this case exceeds 2500 pages, most of which are Ms. Thompson's medical records, the earliest from a hospitalization for pneumonia from late May 2002 (R. 399-428), and the last one a Psychiatric/Psychological Impairment Questionnaire completed by Ms. Thompson's psychiatrist, Dr. Lisa Polsby, in early July 2011 (R. 2539-46). On August 1, 2012, Ms. Thompson passed away at age 59, with the cause of death listed as, "sarcoidosis lung, obstructive sleep apnea, HTN [hypertension]" and other significant conditions contributing to death listed as "obesity, osteoarthritis, asthma" (doc. # 28-1: Plaintiff's Memorandum in Support of Summary Judgment ("Pl.'s Mem."), Ex. A). The critical inquiry, however, is not Ms. Thompson's condition as of her untimely death in 2012, but instead whether Ms. Thompson became disabled during the period from May 1, 2002 through June 30, 2003, the date she was last insured. *See Pepper v. Colvin*, No. 12-2261, 2013 WL 1338123, at *1 (7th Cir. Apr. 4, 2013); *Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008).

**B.**

The medical records during the time period between Ms. Thompson's alleged disability onset date of May 1, 2002, and her date last insured of June 30, 2003, begin with a hospital stay

from May 28, 2002, through June 3, 2002 (R. 398-428). On May 28, 2002, Ms. Thompson was admitted to St. James Hospital in Olympia Fields, Illinois, suffering from shortness of breath and swelling in her legs (R. 399, 401). Her medical history was listed as "[h]ypertension, asthma, and pneumonia" (R. 399, 414), and her weight was recorded as 217 pounds (R. 401). According to Dr. Asma Khatoon's treatment notes from the hospital stay, Ms. Thompson had been complaining of shortness of breath for three weeks, had seen her primary care physician three times during that period, had been diagnosed with pneumonia, and had been treated with antibiotics (R. 414). She had "tolerated these symptoms for two weeks and had been in Vegas one week ago where she suddenly developed lower extremity edema for the first time" (Id.). During her hospital stay, Ms. Thompson had a pulmonary medicine consultation, and a cardiology consultation, which ruled out congestive heart failure (R. 399, 407-13). Those reports noted that she had experienced wheezing and coughing for about five to six days prior to her admission to the hospital and that she has had a chronic cough with phlegm for years (R. 408). Ms. Thompson described a history of wheezing "on and off over the past 15 to 18 years" with her first asthma-type breathing attack sending her to the hospital 18 years before (Id.). She was diagnosed with "reversible airway disease with atypical pneumonia," discharged on June 3, 2002, and told to follow up with a pulmonary specialist as well as her family physician (R. 399-400).

On August 22, 2002, Ms. Thompson saw Dr. Mirza Baig at WellGroup Health Partners for a referral for a bronchoscopy (R. 2090-91). In treatment notes for that day, Dr. Baig recorded that "[p]atient is comfortable. Denies any cough or congestion" and had no edema (Id.). At that time, she weighed 232 pounds, and her medications were Advair 50/50 and Dyazide (Id.). Dr. Baig referred Ms. Thompson to Dr. Robert Kemp, a pulmonologist, who saw Ms. Thompson on

September 30, 2002, and ordered blood tests and chest x-rays, which showed normal heart size, and "[f]indings consistent with the clinical diagnosis of Boeck's sarcoidosis" (R. 2084-89).[4] Dr. Kemp reviewed Ms. Thompson's medical history and noted that Ms. Thompson had prednisone therapy for a couple months after her May 2002 hospitalization, which Ms. Thompson believed decreased her cough (R. 2084). Nevertheless, she complained of intermittent coughing, which she said had been going on for two years, but she denied any significant shortness of breath (Id.). Dr. Baig listed his impression as:

> Interstitial pneumonitis. . . Has a history of partial response symptomatically to prednisone therapy that has only been given for a short duration. Consideration includes the possibility of interstitial lung disease, however serologies were negative. Also consider possibility of sarcoidosis. Doubt hypersensitivity pneuomonitis.

(Id.).

On November 7, 2002, Ms. Thompson went to Dr. Baig complaining of a cough and congestion (R. 2080). Dr. Baig recorded his impression as "[u]pper respiratory infection" and "[c]ough" and recorded her weight as 227.8 pounds (R. 2080-81). Ms. Thompson had a bronchoscopy and transbronchial biopsy on November 4, 2002 (R. 261), and on November 11, 2002, Ms. Thompson returned to Dr. Kemp for a follow-up after the bronchoscopy (R. 2078). Dr. Kemp advised Ms. Thompson that the bronchoscopy demonstrated "non-casing granulomas consistent with sarcoidosis" and noted that she was willing to re-start prednisone therapy (Id.). Her weight at that appointment was 223 pounds (R. 2079). When Dr. Kemp saw Ms. Thompson again on December 30, 2002, she told him that she was suffering significant side effects from the

---

[4] "Sarcoidosis is a disease caused by small areas of inflammation. It can affect any part of the body but is most common in the lungs – called pulmonary sarcoidosis. In pulmonary sarcoidosis, small patches of inflamed cells can appear on the lungs' small air sacs (alveoli), breathing tubes (bronchioles) or lymph nodes. The lungs can become stiff and may not be able to hold as much air as healthy lungs. In serious cases, sarcoidosis can cause scar tissue in the lungs, which can affect the lungs' ability to move oxygen into the bloodstream." American Lung Association – Sarcoidosis, http://www.lung.org/lung-disease/sarcoidosis (last visited April 16, 2013). In addition, "[s]arcoidosis may be self-limited or chronic and is subject to episodic remissions and recrudescence (recurrence)." 9ATTORNEYS' TEXTBOOK OF MEDICINE, Ch. 65G.00 (3d ed. 2010).

prednisone, including insomnia, fatigue, and weight gain (R. 2076). On the other hand, she did feel like her cough and shortness of breath had improved (*Id.*). Dr. Kemp recommended reducing the prednisone dosage, but continuing the therapy for another six weeks to three months (*Id.*). Her weight at this appointment was 240 pounds (R. 2077). In January 2003, at a first-time health maintenance visit at the Jesse Brown VA Medical Center ("Jesse Brown"), Ms. Thompson reported that she had gained forty pounds since starting on the prednisone (R. 1105-07). On January 30, 2003, Ms. Thompson participated in a depression screening test at Jesse Brown, and the results were negative for a mood disorder (R. 1104-05).[5]

By February 6, 2003, though, Ms. Thompson reported to Dr. Kemp that decreasing the prednisone dosage had made "significant improvement in her side effects. She has no problems now with insomnia. She denies any fatigue. Her weight has been relatively stable. . . She denies any cough or shortness of breath" (R. 2073). And Dr. Kemp listed his impression as "Sarcoidosis -- appears to be relatively well, asymptomatic" (*Id.*). A radiology report from that same date requested by Dr. Kemp recorded an impression, "Findings are consistent with residual of Boeck's sarcoidosis. There is improvement of findings when compared with the study of 9/30/02" (R. 392, 2072).

On March 13, 2003, Dr. Kemp reported the following results from a Pulmonary Function Test for Ms. Thompson:

> Lung volumes demonstrate a moderate reduction in total lung capacity, but a severe reduction in functional residual capacity and residual volume. Spirometry demonstrates moderate reductions in forced vital capacity and FEV1. However, FEV1/FVC ration is only borderline reduced. Flows relative to lung volume are actually within normal limits. . . . Maximum voluntary ventilation is mildly reduced. . . . Impression: 1. Moderate restrictive lung disease. . .

---

[5] This is the only mention of any testing for mental health issues that we found in the record during the relevant time period. We are not aware of any medical evidence from the time period through June 2003 that suggests that Ms. Thompson suffered from depression.

(R. 2070). And in his April 14, 2003 treatment notes discussing this test, Dr. Kemp also observed that Ms. Thompson stated that "her breathing has been relatively stable since the last evaluation. She has not had any worsening shortness of breath or cough" (R. 2068). Although Ms. Thompson felt that the decrease in prednisone "has led to some general malaise," it had not caused her breathing to worsen (*Id.*). At this appointment, she weighed 248 pounds (R. 2069).

In the month following Ms. Thompson's last insured date, in a treatment note from July 2003, Dr. Kemp reported, "Sarcoidosis – appears to be stable on a prolonged tapering course of prednisone therapy" and recorded her weight as 233 pounds (R. 2059-60), and that same month, in examining Ms. Thompson for her hypertension, Dr. Baig noted, "No chest pain. Lungs are clear. No shortness of breath. . . . Extremities have no pitting edema or cramps" and listed his impression as "Controlled hypertension" (R. 2063).

## C.

The remainder of Ms. Thompson's medical records chronicle her many medical treatments continuing through July 2011. In August 2003, Ms. Thompson underwent surgery to remove a colon mass (R. 247, 254-60). There appears to have been a period shortly thereafter when she was not seeking treatment for the sarcoidosis. For example, in September 2005, Dr. Kemp reported that Ms. Thompson had "been lost to follow up for the last two years," but at that point, Ms. Thompson, "in fact, state[d] she was doing quite well with no significant complaints of shortness of breath" (R. 2152). He listed his impression as "Sarcoidosis – chest x-ray actually demonstrates no significant changes over the last two years" (*Id.*). By December 2005, Ms. Thompson told Dr. Kemp that since the last appointment, she had been "relatively stable and significantly improved" (R. 2130). A May 2006 treatment note from WellGroup Health Partners reported that Ms. Thompson "reports doing very well. She weaned off of prednisone

03/29/2006. She states that she is feeling great. She denies any limitations due to shortness of breath" (R. 2122).

But, in September 2007 and June 2008, Ms. Thompson suffered bouts of respiratory distress, asthmatic bronchitis, and later, flare-ups of her sarcoidosis symptoms (R. 271-85, 2117, 2095).[6] In addition, in mid-2008, Ms. Thompson was hospitalized with complaints of anxiety, insomnia, and visual hallucinations (R. 334-56) and experienced "steroid-induced mania and or affective disorder (bipolar) secondary to general medical condition . . . sarcoidosis and asthma" (R. 667). In addition, in January 2010, Ms. Thompson was injured in a car accident and subsequently suffered headaches, leg pain, memory problems and slurred speech (R. 2451-54, 2461-64).

In November 2008, Ms. Thompson began treatment with Dr. Lisa Polsby, a psychiatrist, and continued to receive care from Dr. Polsby through at least July 2011 (R. 2539). On July 6, 2011, Dr. Polsby completed a Psychiatric/Psychological Impairment Questionnaire, which included Dr. Polsby's diagnosis of Ms. Thompson's mental condition and assessed Ms. Thompson's limitations in the areas of understanding and memory, sustained concentration and persistence, social interactions, and adaptation (R. 2539-46). Dr. Polsby found that Ms. Thompson suffered from affective disorder (bipolar) secondary to her general medical condition (sarcoidosis) and its treatment (steroids) (*Id.*).

## D.

Three different consulting physicians reviewed the medical record in this case; none examined Ms. Thompson. On April 15, 2010, state agency consulting physician Dr. Vidya

---

[6] In a September 2007 treatment note from the hospitalization for asthmatic bronchitis, Dr. Baig recorded Ms. Thompson's medical history of sarcoidosis as follows: "PAST MEDICAL HISTORY: Known sarcoidosis approximately four years ago, diagnosed by bronchoscopy. She was on prednisone for a couple of years and not taking the prednisone at this time. Sarcoidosis appears to be stable and in remission with no treatment required" (R. 274; 1981).

Madala reviewed Ms. Thompson's medical record and completed an "Illinois Request for Medical Advice," ("IRMA") in which she concluded that there was "insufficient evidence to properly evaluate [the] allegations of pulmonary sarcoidosis before [the] DLI [date last insured] of 6/30/03" and therefore checked the box stating, "This claim is being denied for insufficient evidence prior to DLI/LDPP/LDP" (R. 1229-31).

In response to Ms. Thompson's motion for reconsideration, a second state agency consulting physician, Dr. Bharati Jhaveri, completed an IRMA on June 30, 2010 (R. 1584-86). At that point, in addition to the sarcoidosis, Ms. Thompson alleged knee and back pain from her car accident (R. 1584). Dr. Jhaveri highlighted a few items from the medical record, including that Ms. Thompson was diagnosed with sarcoidosis in 2002, that a treatment note from April 14, 2003 reflected that she was in stable condition, and that the record reflected that Ms. Thompson had been on a tapered dose of prednisone, which had stopped in July 2003 (R. 1586).[7] In addition, Dr. Jhaveri noted a recent pulmonary function test that predicted a lung capacity of 50 percent (*Id.*). Nevertheless, Dr. Jhaveri affirmed Dr. Madala's conclusion from the April 15, 2010 IRMA (R. 1585), agreeing that there was still insufficient medical evidence to determine the severity of Ms. Thompson's limitations as of June 30, 2003 (R. 1586).

On October 1, 2010, an ALJ sent a request to Dr. Sai Nimmagadda, a pulmonary specialist, to review the medical evidence in this case and to complete a "Medical Interrogatory Physical Impairment(s) Adult" ("Interrogatory") regarding Ms. Thompson's limitations (R. 1873). On October 11, 2010, Dr. Nimmagadda completed the Interrogatory and a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" ("MSS") (R. 1874-85). In the MSS, Dr. Nimmagadda opined that Ms. Thompson could lift and carry up to 10 pounds

---

[7] It is unclear when Ms. Thompson began prednisone therapy again after July 2003, but it appears that she had at least another short course of prednisone treatment at least as early as September 2005 (R. 2144).

continuously, 11 to 20 pounds frequently, could never lift or carry anything heavier than 20 pounds; could sit and stand for four hours and walk for two hours in an eight-hour work day; had no limitation on the use of her hands and feet; had no vision or hearing impairments; and could only occasionally tolerate dust, odors, fumes, and pulmonary irritants (R. 1874-78). The following questions appeared on the final page of the MSS form just above the signature line:

> The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present?
> Have the limitations you found above lasted or will they last for 12 consecutive months?

(R. 1879). Dr. Nimmagadda responded that the limitations were first present between the alleged onset date and the date last insured and that they had lasted for twelve consecutive months (*Id.*).

In the Interrogatory, Dr. Nimmagadda concluded that Ms. Thompson's impairments did not meet or equal any impairment described in the Listing of Impairments (R. 1882), and attached an explanation for that conclusion (R. 1883-85). In the explanatory notes, Dr. Nimmagadda listed Ms. Thompson's history of respiratory problems – asthma and sarcoidosis – and more recently knee and back pain, and then analyzed Ms. Thompson's limitations first in the periods between the alleged onset date and the date last insured, and then from the date last insured through October 2010, observing that most of the medical records were after the date last insured (*Id.*).

For the period from May 2002 through June 30, 2003, Dr. Nimmagadda stated that Ms. Thompson was diagnosed with respiratory problems in May 2002, received the sarcoidosis diagnosis in November 2002, improved with prednisone therapy, and though her pulmonary function was reduced, was able to perform most of her activities of daily living at that time (R.

1884). Dr. Nimmagadda opined that during that period, Ms. Thompson's impairments were severe, and she would be limited to light work, based on the prednisone use (*Id.*).

### E.

At the administrative hearing, held on July 27, 2011, two witnesses testified: Ms. Thompson, represented by Barry O'Lynnger, and a vocational expert ("VE") (R. 30-54).[8] At the outset of the hearing, the ALJ advised Ms. Thompson that she would be considering the claim from the alleged onset date through the date last insured (R. 33). Ms. Thompson's representative, Mr. O'Lynnger, then made some opening remarks. He stated that from May 2002 through June 2003, Ms. Thompson suffered sarcoidosis and asthma, and although she would testify that she experienced depressive symptoms during that period, her treatment for that did not start until later (R. 34).[9] But from that time frame and past, he contended, she also suffered a lot of side effects from the prednisone, which in combination with her other symptoms, would prevent her from functioning on a full-time competitive basis (*Id.*). Finally, he asserted, "Some of the pulmonary function studies are pretty close to listing levels right after the date last insured. Although it's meant they don't really qualify at listing level, they certainly indicate that there's some pretty substantial deficits in her ability to breathe" (*Id.*).

Ms. Thompson testified that she had graduated from college, had a master's degree in health care administration and marketing, and had not worked since May 2002 (R. 35). For a

---

[8] Ms. Thompson signed a fee agreement with Binder & Binder, with Charles Binder signing as her primary representative and Mr. O'Lynnger signing as co-representative (R. 117). Although both the ALJ and Mr. Thompson stated that Ms. Thompson was represented by counsel at the hearing, we note that Mr. O'Lynnger signed an "Appointment of Representative" form, checking the box specifying that he was a "non-attorney" (R. 16; doc. # 28 at 3; R. 118). We note this discrepancy only for clarity. No issue has been raised regarding whether Ms. Thompson was represented.

[9] On July 25, 2011, an attorney for Ms. Thompson had also sent a letter to the ALJ summarizing evidence regarding her claim, including "a history of chronic and severe asthma and sarcoidosis," as well as "chronic back pain, hypertension and depression" (R. 2535). Ms. Thompson did not testify regarding any "depressive symptoms," but did mention that the steroid treatment had side effects that disrupted her sleep and could make her feel like "being on a high for maybe two or three days" (R. 42).

period of five or six years until 1993, she worked as a supervisor for Prudential Insurance credentialing the physicians who participated in the HMO program (R. 35-36). From '93 through '96, she had a public relations/marketing position that required her to travel (R. 37-38). Next, she worked as an administrative assistant for a physician associated with the World Bank (R. 38-39). Ms. Thompson testified that her earnings stopped in 1999 because she relocated to this area, and she was not able to find a job here (R. 40). In the period from 2002 to 2003, she explained that she could not work because she was "being hospitalized at least two or three times a year for the sarcoidosis," with the stays lasting from "overnight to maybe a week" (R. 41). During that time period, she was having difficulty with breathing, walking across a room without stopping, and fatigue (R. 42). Ms. Thompson also struggled with prednisone side effects, including not being able to sleep more than two hours at that time (*Id.*). She saw Dr. Kemp from WellGroup every two months (*Id.*). Since 2003, Ms. Thompson believed her condition had deteriorated, and in 2008 for about a year, she testified that she was using oxygen "around the clock" (R. 43).

Ms. Thompson testified that in a normal day between 2002 and 2003, she would get her own breakfast, take care of her personal hygiene, get on the computer, watch television, or read (R. 44). She could do household chores, including some dishwashing, dusting, and vacuuming (*Id.*). She could stand for only five minutes, but had no problems sitting (R. 45).

In response to questions from her representative, Ms. Thompson remembered that she also experienced the prednisone side effects of fatigue and weight gain (R. 46). She also stated that she often experienced shortness of breath when she was standing for a long time, especially washing dishes (R. 47). She did not believe that in 2002 to 2003 she would have been able to

have a job where she had to talk a lot (R. 48). In addition, she stated that she would have had to be off work once or twice a month due to fatigue and breathing difficulty (R. 48-49).

The VE testified that Ms. Thompson's previous jobs classified as sedentary and skilled, but light as performed (R. 50). The ALJ asked whether any of Ms. Thompson's past work would be available to a hypothetical person of Ms. Thompson's age, education, and work history, who is restricted to light work with no concentrated exposure to respiratory irritants, temperature extremes, or humidity. The VE responded that "all of her past work would be available as per described in the DOT," but not the public relations job as Ms. Thompson had performed it (R. 51). If the hypothetical person were limited to sedentary work, the VE testified that Ms. Thompson's past work as an administrative assistant as described by the DOT would be available, but not as performed; her past work as a quality assurance coordinator would be available, both as described by the DOT and as performed; but she would not be able to perform the public relations job as she had performed it (*Id.*). The VE testified that there would be no work if the hypothetical person needed to miss 20 days of work per year, was off-task 30 percent of the time, or could not communicate because of difficulty speaking for prolonged periods (R. 52-53).

## F.

In the written opinion on August 18, 2011, the ALJ found that Ms. Thompson was not disabled under the Act through June 30, 2003 (R. 23). In evaluating Ms. Thompson's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other

work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

Here, the ALJ found that Ms. Thompson had not engaged in substantial gainful activity during the period from her alleged onset date of May 1, 2002, through her date last insured of June 30, 2003 (R. 18). At Step 2, the ALJ found during that relevant time period that Ms. Thompson had the severe impairments of asthma, sarcoidosis, obesity, and hypertension (*Id.*).

At the third step, the ALJ determined that Ms. Thompson's impairments did not meet or medically equal a listed impairment (*Id.*). *First*, the ALJ reasoned that Ms. Thompson had not established all of the criteria to demonstrate that her sarcoidosis and asthma met or medically equaled Listings 3.02 or 3.03: "Pulmonary function testing does not indicate restrictions as identified in Listing 3.02, and the claimant has not had asthma attacks occurring at least once every two months or at least six times a year in spite of prescribed treatment" (*Id.*). *Second*, Ms. Thompson's hypertension did not meet or equal the cardiac listings (*Id.*). *Third*, even considering Ms. Thompson's obesity did not raise any of the impairments to listing level (*Id.*). *Fourth*, the state agency doctors did not find that Ms. Thompson's impairments met or equaled any listings; there is no medical opinion in the record finding that her impairments reached

listing level; and even the claimant's representative did not allege in his brief that any listing was met or equaled (*Id.*).

The ALJ then found that through the date last insured, Ms. Thompson had the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(b) involving no concentrated exposure to respiratory irritants, temperature extremes, or humidity" and that Ms. Thompson's allegations of disabling limitations were not credible (R. 19). Having reviewed Ms. Thompson's testimony, the ALJ then supported her RFC and credibility findings with a review of Ms. Thompson's medical records from the May 2002 hospitalization through subsequent treatment, including the prednisone therapy, its side effects, and the testing of Ms. Thompson's pulmonary function (R. 19-20). The ALJ observed that in the relevant time period, Ms. Thompson's breathing improved with the prednisone therapy, and her side effects were alleviated by tapering the prednisone dosage (R. 20). The ALJ considered medical records that reflected that in July 2003 Ms. Thompson's hypertension was assessed as controlled, but that in September 2004, when she forgot to take her medications, the treatment notes reflected that it was uncontrolled (R. 21). The ALJ deemed Ms. Thompson's weight gain on prednisone as "not that significant" and observed that the record did not reveal any problems, other than hypertension, caused by the weight during the critical period (*Id.*).

The ALJ went on to discuss the record after the date last insured and what it revealed of Ms. Thompson's condition through 2010, including medical treatments for a colon mass, leg swelling, sarcoidosis, anxiety, and asthma (R. 21). In addition, the ALJ noted that Ms. Thompson received 60 percent service-connected disability in June 2008 and "considered herself retired" (*Id.*).

In assessing Ms. Thompson's credibility, the ALJ stated that she had considered all of the SSR 96-7p factors, and specifically addressed Ms. Thompson's activities. The ALJ concluded that while Ms. Thompson had some limitations, she "was able to engage in a wide array of daily activities despite her symptoms" both during and after the relevant time period, mentioning Ms. Thompson's May 2002 Las Vegas trip, exercising and attending a picnic in 2005, and in 2010 volunteering at her grandson's school for several hours (R. 21). Also, the ALJ observed that Ms. Thompson received only minimal treatment during the relevant time period and just after it (*Id.*). The ALJ discussed and analyzed the evidence regarding medication side effects and concluded that during the relevant time period, Ms. Thompson experienced significant improvement (R. 22).

In reviewing the opinion evidence, although the state agency doctors found insufficient evidence of a severe impairment before the end of the insured status, the ALJ gave Ms. Thompson the benefit of the doubt and found her impairments severe (R. 22). But the ALJ used the state agency doctors' opinions to highlight the dearth of evidence during the relevant period. The ALJ gave great weight to Dr. Nimmagadda's opinion, because Dr. Nimmagadda is a pulmonary specialist whose findings were well-supported by and consistent with the record (*Id.*). No weight was accorded the September 19, 2005 decision from the Veterans Administration determining that Ms. Thompson was 60 percent disabled because it was outside the relevant time period and did not provide a function-by-function analysis of Ms. Thompson's restrictions (*Id.*, citing R. 2493).

At Step 4, through the date last insured, the ALJ found that Ms. Thompson could perform past relevant work as a quality assurance coordinator, public relations representative, and

administrative assistant, given her RFC (R. 22-23). Consequently, the ALJ concluded that Ms. Thompson was not disabled through June 30, 2003 (R. 23).

### III.

Ms. Thompson died on August 1, 2012. Her husband, Mr. Thompson, now contends that the ALJ's finding must be reversed or remanded.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). We will not reweigh the evidence or substitute our judgment for that of the ALJ's. *Pepper v. Colvin*, No. 12-2261, 2013 WL 1338123, at *8 (7th Cir. April 4, 2013). A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

This case presented challenges for the ALJ because though the critical period for establishing that Ms. Thompson was entitled to disability benefits was from May 1, 2002 through June 30, 2003, Ms. Thompson did not file her application until February 23, 2010 and her hearing was not held until July 27, 2011. The medical records for the relevant time period are sparse, comprising little more than 100 pages of this voluminous record. Much of the record reflects later health challenges that Ms. Thompson faced and treatment that she received. While we acknowledge that Ms. Thompson's condition worsened and that she has now passed away, we must emphasize that to recover benefits, she had to establish that she was disabled before the expiration of her insured status at the end of June 2003. *See Pepper*, 2013 WL 1338123, at *1; *Eichstadt*, 534 F.3d at 666 (finding that current disability does not prove earlier disability); *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997); *Hilkert v. Astrue*, No. 12-CV-55-JPS,

2013 WL 149347, at *1, *5 (E.D. Wis. Jan. 14, 2013); *Boyd v. Astrue*, No. 09 C 1217, 2009 WL 5149136, at *10 (N.D. Ill. Dec. 28, 2009) (evidence of severe impairment post-dating the date last insured does not support the proposition that plaintiff was disabled on date last insured); *Wescott v. Astrue*, No. 4:08-cv-36, 2009 WL 3739427, at * 7-8 (N.D. Ind. Nov. 5, 2009). And as the Seventh Circuit noted in *Eichstadt*, "The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time." 534 F.3d at 668. That is particularly true in this case, where Ms. Thompson did not file her application until nearly seven years after her last insured date.

Mr. Thompson takes issue with three aspects of the ALJ's decision: the credibility determination, the listing analysis, and the RFC determination. We address each argument below and find no reason to overturn the ALJ's decision.

## A.

Mr. Thompson asserts that the ALJ improperly assessed Ms. Thompson's credibility and gave insufficient weight to her testimony as to her functional limitations by mischaracterizing evidence regarding Ms. Thompson's daily activities, failing to note Ms. Thompson's bouts of pneumonia between 2000 and 2002, and not discussing the effects of Ms. Thompson's obesity (Pl.'s Mem. at 7-9). The ALJ is in a special position to hear, see, and assess witnesses, so we give her credibility determination special deference and will only overturn it if it is "patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is

unreasonable or unsupported."). A credibility determination is patently wrong only when it lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

The ALJ here explained in detail what she considered in analyzing the credibility of Ms. Thompson's claimed limitations. In assessing Ms. Thompson's credibility, the ALJ noted that she had considered all of the factors in SSR 96-7p and observed that "[w]hile the claimant has some limitations, she continued to engage in a wide array of daily activities, both during the relevant time period and after the time period" (R. 21). The ALJ referred to Ms. Thompson's May 2002 hospital visit and observed that Ms. Thompson had experienced symptoms while on a trip to Las Vegas, but had tolerated them for one week while on the trip (*Id.*). Mr. Thompson claims that "[t]he record does not indicate any such thing" (Pl.'s Mem. at 7). To the contrary, the ALJ cited a record from Ms. Thompson's hospital stay that stated, "[t]he patient tolerated these symptoms [shortness of breath and coughing] for two weeks and had been in Vegas one week ago where she suddenly developed lower extremity edema for the first time" (R. 414).[10]

In addition, Mr. Thompson alleges that the ALJ omitted mention of a significant piece of evidence from the relevant time period: evidence of Ms. Thompson's bouts of pneumonia between 2000 and 2002 (Pl.'s Mem. at 8; doc. # 33: Plaintiff's Reply to Defendant's Cross Motion and Response to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply") at 3). The ALJ addressed Ms. Thompson's May 2002 hospitalization twice, however, discussing the evidence to support the RFC, and again to support the credibility determination, noting that this episode was part of the "limited treatment" Ms. Thompson received "during the relevant time period" (R. 19, 21). While the ALJ does not mention the word "pneumonia," the ALJ discussed Ms. Thompson's edema, interstitial lung disease, sarcoidosis, prednisone treatment – all based on

---

[10] The cardiology consultation notes from the same hospitalization similarly mentioned the Las Vegas trip: "This is a 49-year-old female who presented with shortness of breath and swelling of the lower extremity. It started Thursday. She had been in Las Vegas. She had been short of breath for three weeks prior to that" (R. 412).

Ms. Thompson's records from the May 2002 hospital stay and subsequent treatment. In fact, the ALJ cites to the hospital record that mentions pneumonia, showing that the ALJ did not overlook these records in making her decision (R. 19, citing 3F/6 (R. 399)). Mr. Thompson's argument that the ALJ ignored this evidence is simply incorrect.

Furthermore, though Mr. Thompson assails the ALJ for not discussing "how Ms. Thompson's obesity impacts her pulmonary limitations," the ALJ did address Ms. Thompson's obesity, tracking her weight gain from the prednisone, but concluding that this side effect was not significant because the record did not "document problems with her back, joints, or cardiac functioning (other than hypertension) during the critical period" (Pl.'s Mem. at 9; R. 21). Without evidence that her obesity exacerbated her underlying conditions and further limited her functioning, the ALJ did not err in finding its impact on Ms. Thompson's limitations insignificant. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Mr. Thompson contends that the ALJ relied on Ms. Thompson's activities long after the relevant time period to undermine Ms. Thompson's claims of significant limitations. This misstates the record. The ALJ considered evidence of Ms. Thompson's Las Vegas trip and her response to medical treatment during the relevant time period, in addition to Ms. Thompson's activities in the period after her last insured date. Furthermore, the ALJ's discussion of Ms. Thompson's daily activities after the relevant time period bolstered the credibility finding. Mr. Thompson asserts that the ALJ took the statements about Ms. Thompson's activities out of context. For example, the ALJ's statement that Ms. Thompson had "an active life and considered herself retired" (Pl.'s Mem. at 7, referring to R. 21), omitted that she had retired because "she found herself unable to concentrate and focus on the detailed work she needed to be

able to perform" (R. 1016). Despite Ms. Thompson's reasons for retiring, however, the ALJ found the admission regarding an active life to be significant. In so doing, the ALJ also relied on a treatment note from June 2008, in which Ms. Thompson stated that she and her husband were retired and that she joins her husband gambling sometimes (R. 1016), and another from early 2010 in which Ms. Thompson described her home life as "very active and supportive" and that she volunteered twice a week at her grandson's school for several hours (R. 1147). We do not fault the ALJ's consideration of this evidence in assessing Ms. Thompson's credibility.

Likewise the ALJ did not err in considering 2005 medical notes suggesting that Ms. Thompson exercised regularly and attended a picnic on a hot day. As Mr. Thompson correctly points out, the ALJ did not mention that Ms. Thompson experienced chest tightness and wheeze at the picnic. While it might have been preferable to complete the picture, the ALJ was allowed to weigh the evidence and draw the inference that such breathing episodes did not deter Ms. Thompson from these activities. Moreover, as explained above, the "long lapse in time raises obvious evidentiary problems," so the ALJ considered later activities to assist in determining whether to believe Ms. Thompson's testimony about her limitations. *Eichstadt*, 534 F.3d at 666.

Here, the ALJ explained and supported her credibility finding. While some of the discussion of activities after the relevant period might have benefited from greater context, Mr. Thompson has not persuaded us that the ALJ's credibility finding was patently wrong.

**B.**

Mr. Thompson next argues that the ALJ "played doctor" in concluding that Ms. Thompson's limitations did not meet or equal a listed impairment (Pl.'s Mem. at 10-12; Pl.'s Reply at 6-8). This argument lacks merit. Here, the ALJ specified that she was considering Ms. Thompson's asthma and sarcoidosis under sections 3.02 and 3.03 of the Listings and her

hypertension under the cardiac listings (R. 18). She noted that the pulmonary function testing did not show the restrictions specified in Listing 3.02, that Ms. Thompson did not have asthma attacks every two months despite prescribed treatment, and that cardiac listings were not met or equaled (*Id.*). The ALJ further stated that while there is no specific listing for obesity, she additionally considered that impairment and found that no listing had been met or equaled (*Id.*). The ALJ relied upon the state agency doctors to support her finding, noting that the record contained no contrary medical opinions and that even Ms. Thompson's "representative, in his brief, did not allege that any listing was met or equaled" (*Id.*; *see also* R. 2535-37 (representative's brief)). We note also, that at the hearing, Ms. Thompson's representative stated, "[s]ome of the pulmonary function studies are pretty close to listing levels right after the date last insured. Although it's meant they don't really qualify at listing level, they certainly indicate that there's some pretty substantial deficits in her ability to breathe" (R. 34). In addition, Ms. Thompson's representative's letter to the Appeals Council never raised the argument that her impairments met or medically equaled a listing (R. 238-40).

Mr. Thompson has the burden of proving that Ms. Thompson's condition meets or equals each criterion of a listed impairment. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). And while an ALJ must mention the specific listings and provide more than a "perfunctory analysis," *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004), the ALJ here has met those obligations. Mr. Thompson argues that the ALJ erred in relying on Dr. Nimmagadda's opinion and the ALJ's own analysis of how the obesity and hypertension affected Ms. Thompson (Pl.'s Mem. at 10). He contends that because Dr. Nimmagadda's opinion did not mention hypertension or obesity, the ALJ merely relied on her own conclusions about the effects of those impairments. He further contends that the ALJ should have sought the advice of a medical

expert regarding the impact of the obesity and the hypertension. But Dr. Nimmagadda stated in her explanation that she had reviewed extensive records from the VA/Jesse Brown Hospital and from St. James Hospital (R. 1884). The records she reviewed included references to Ms. Thompson's weight and hypertension, and she found nothing to meet or equal a listed impairment. In addition, the two other state agency doctors to review the record found insufficient evidence to even find any severe impairments. There was no basis for the ALJ to request yet another doctor to review the minimal records in the relevant time period.

Moreover, Mr. Thompson makes no effort to show that Ms. Thompson's condition met or equaled any listing, as was his burden to do. Mr. Thompson has not established that the ALJ's conclusions lacked a sufficient evidentiary basis in the administrative record. Therefore, the ALJ's finding stands as made, supported as it is by substantial evidence, and uncontradicted by the opinions of medical experts. *See Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (ALJ need not articulate reasons for adopting state agency doctors' findings when there is no evidence to support claimant's position that her conditions met or equaled a listing); *Pelka v. Astrue*, No. 11-CV-809, 2013 WL 452800, at *9 (N.D. Ill. Feb. 6, 2013) (same).

## C.

Finally, Mr. Thompson challenges the ALJ's RFC analysis, contending that the ALJ improperly relied solely upon Dr. Nimmagadda's opinion – which did not mention obesity, hypertension, or medication side effects, and failed to consider the opinion of Ms. Thompson's treating psychiatrist (Pl.'s Mem. at 13). Again, we are unpersuaded.

In assessing an applicant's RFC, an ALJ should consider all of the relevant medical and nonmedical evidence in the record. 20 C.F.R. § 404.1545(a)(3); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). This includes an applicant's reports of daily activities. SSR 96–8p.

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

Here, the ALJ concluded that Ms. Thompson had the RFC to perform light work without concentrated exposure to respiratory irritants, temperature extremes, or humidity (R. 19). Contrary to Mr. Thompson's arguments, the ALJ did not rely solely on Dr. Nimmagadda's opinion. To support the RFC assessment, the ALJ reviewed Ms. Thompson's testimony, treatment records from the relevant time period, treatment records and activities of daily living after the relevant time period, testimony and treatment records regarding medication side effects, a Veterans Administration record from 2005 finding Ms. Thompson 60 percent disabled, and opinion evidence from state agency reviewing doctors (R. 19-22).

Although the ALJ gave "great weight" to Dr. Nimmagadda's opinion, that was only in addition to a careful analysis of Ms. Thompson's voluminous medical record (R. 22). Mr. Thompson challenges Dr. Nimmagadda's opinion for failing to mention obesity, hypertension, or medication side effects. But the ALJ reviewed the record and analyzed each of these issues in determining Ms. Thompon's RFC (R. 21 – hypertension, obesity; R. 22 – side effects).

Mr. Thompson accurately points out that the ALJ failed to discuss the opinion of Ms. Thompson's psychiatrist, Dr. Polsby, who had treated her since 2008 (Pl.'s Mem. at 13; Pl.'s Reply at 6). On July 7, 2011, Dr. Polsby completed a "Psychiatric/Psychological Impairment Questionnaire" in which she diagnosed Ms. Thompson with "affective disorder (bipolar) secondary to general medical condition (sarcoidosis) and it treatment (steroids)" and noted episodes of depression and mania with a psychiatric hospitalization in June 2008 (R. 2539-46). Dr. Polsby opined that Ms. Thompson had mild limitations in the ability to maintain attention

and concentration for extended periods, and marked limitations in the abilities to perform activities within a schedule and to complete a normal workweek without interruptions from psychologically-based symptoms (R. 2542-43). Dr. Polsby also concluded that Ms. Thompson would likely be absent from work more than three times a month as a result of her impairments or treatment (R. 2546). For the reasons that follow, we conclude that the ALJ's failure to discuss Dr. Polsby's report does not require a remand.

An ALJ is not required to address every piece of evidence or testimony presented. *Kastner*, 697 F.3d at 646. Of course, we understand the special value that generally attaches to treating physicians' opinions, and that typically ALJs fail to mention them at their peril. 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive. . . Generally, we give more weight to opinions from your treating sources"); *see, e.g., Fike v. Astrue*, No. 1:11–CV–00168, 2012 WL 1200670, at *7 (N.D. Ind. April 10, 2012) ("generally speaking, an ALJ's failure to discuss a treating physician's opinion necessitates a remand of the Commissioner's final decision"); *Snider v. Astrue*, No. 1:08–cv–53, 2009 WL 1766925, at *2 (N.D. Ind. June 23, 2009) (collecting cases and articulating that "the ALJ contravened longstanding administrative and judicial precedent when he failed to evaluate the opinion of [the claimant's] treating physician"); *Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1006 (N.D. Ill. 2008) ("[T]he Seventh Circuit has consistently held that an ALJ must articulate his reasons for rejecting a treating physician's opinion." (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004))). In light of this authority, the ALJ here would have been well-advised at least to briefly acknowledge Dr. Polsby's opinion, and then explain why she found it worthy of no weight in ascertaining the magnitude of Ms. Thompson's limitations during the time in question.

We find it hard, however, to fault the ALJ for omitting any mention of Dr. Polsby's opinion. As a threshold matter, Mr. Thompson's briefs offer little by way of raising this argument, mentioning the omission in a single sentence in the opening brief and in a paragraph in the reply without citing a single case (Pl.'s Br. at 13; Reply at 6). Though such a generalized assertion of error is not sufficient to challenge an adverse ruling, and undeveloped or unsupported arguments are waived, *see Cadenhead v. Astrue*, 410 F. App'x 982, 984 (7th Cir. 2011), we address the issue for sake of completeness.

Turning to the substance of the issue, plaintiff has failed to show why Dr. Polsby's opinion was relevant to the ALJ's inquiry into Ms. Thompson's limitations during the critical time period. Dr. Polsby's opinion regarding Ms. Thompson's bipolar disorder and mental limitations was issued in July 2011, more than eight years after Ms. Thompson's last insured date (R. 2539-46). Although Dr. Polsby states that she started treating Ms. Thompson in November 2008, the opinion does not purport to offer a retrospective opinion about Ms. Thompson's mental health condition between 2002 and 2003. To the contrary, Dr. Polsby wrote that "in [her] best medical opinion" June 2008 was "the earliest date that the description of symptoms and limitations in this questionnaire applied" (R. 2546). In addition, the opinion does not reveal whether Ms. Thompson ever experienced any mental health problems earlier than her psychiatric hospitalization in June 2008 – five years after the relevant date (R. 2541). The only objective evidence of Ms. Thompson's mental status from the time at issue shows that she tested negative for a mood disorder in January 2003 (R. 1104).

Simply falling outside of the relevant time period may not in and of itself eliminate the probative value of the evidence, if the claimant demonstrates that it has some relation back to the critical time period. Here, however, the record does not support an inference that because Ms.

Thompson suffered mental impairments in 2011, or even as early as 2008, that she had those same limitations before July 2003. Dr. Polsby's opinion states that Ms. Thompson's bipolar disorder was secondary to the sarcoidosis and the steroid treatment (R. 2539). But the medical record does not show continuous sarcoidosis symptoms and prednisone treatment from 2002 through 2011. To the contrary, the record reflects that there were periods when Ms. Thompson's symptoms from the sarcoidosis would wane and there were gaps in the prednisone therapy.[11]

Consequently, Mr. Thompson has not shown – and we cannot discern – how Dr. Polsby's opinion was relevant to the question of whether Ms. Thompson was disabled before July 2003. We find no reason to require an ALJ to take the time to mention irrelevant evidence, simply to explain why it is irrelevant. To rule otherwise would eviscerate the principle that ALJ's are not required to address every piece of evidence in the record.

Finally, we conclude that even assuming that it was error for the ALJ to overlook Dr. Polsby's opinion, any such error was harmless. An error is harmless when it is "predictable with great confidence that the agency will reinstate its decision on remand." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *see also McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Here, a review of the records convinces us that no reasonable ALJ would reach a contrary result on remand. Though Dr. Polsby's opinion offers evidence that Ms. Thompson suffered significant limitations from mental impairments from at least as early as June 2008, this evidence was still at least five years after Ms. Thompson's last insured date. By contrast, the record during the relevant period reflected nothing of the magnitude of mental limitations that Dr. Polsby found Ms. Thompson suffered in 2011. In early 2003, Ms. Thompson tested negative for a mood

---

[11] Indeed, the record suggests that there were periods in which Ms. Thompson was feeling better and did not need prednisone therapy. For example, in September 2005, Dr. Kemp noted that she had been "lost to follow up" for two years, but had been doing quite well with no significant complaints of shortness of breath, and again in September 2007, Dr. Baig reported that Ms. Thompson was not on prednisone and her sarcoidosis seemed to be "stable and in remission with no treatment required" (R. 2152, 1981).

disorder (R. 1104), and the record reflects that Ms. Thompson's mental status worsened only after years of prednisone treatment. Mr. Thompson does not explain how Dr. Polsby's diagnosis would have helped the ALJ ascertain Ms. Thompson's limitations during the relevant time period. Consequently, we find that even had the ALJ considered Dr. Polsby's opinion, it would not have changed the outcome here

## CONCLUSION

Based on the foregoing and because there is substantial evidence in support of the decision to deny benefits, plaintiff's motion for reversal and remand is denied, and the Commissioner's motion for summary judgment is granted. The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 18, 2013**